Filed 11/22/13  P. v. Arevalos CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061398 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD233024) |
| ANTHONY AREVALOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Affirmed.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted former San Diego Police Officer Anthony Arevalos of one count of sexual battery by restraint (Pen. Code, § 243.4, subd. (a)),[1] five counts of soliciting a bribe (§ 68), two counts of assault and battery by a peace officer (§ 149) and four counts of misdemeanor false imprisonment (§§ 236, 237, subd. (a)) resulting from his traffic stops of five female drivers. The jury was unable to reach a verdict on a sexual battery count involving one of the drivers, and the court declared a mistrial on that count. The jury acquitted Arevalos of eight counts involving his traffic stops of two other female drivers.

The trial court sentenced Arevalos to eight years eight months in prison--three years on the sexual battery count, consecutive one-year terms on the bribery counts, and a consecutive eight-month term on one of the counts of assault and battery by an officer. The court stayed sentence on the other count of assault and battery by an officer and on the four counts of false imprisonment under section 654.

Arevalos appeals, contending the trial court erred by declining to disqualify the district attorney's office, denying his motion for a new trial and repeatedly interrupting defense counsel's closing argument. Arevalos also contends the evidence was insufficient to support his convictions on certain counts involving three of the victims.

FACTS

On the evening of March 8, 2011, Jane Doe, a bartender, applied for a job at a restaurant/bar in the Gaslamp district of downtown San Diego. Jane Doe consumed one

---

[1]    Statutory references are to the Penal Code unless otherwise specified.

drink and one shot at around 6:00 p.m. She participated in the bar's Mardi Gras float to meet other employees and stayed on the float from 8:30 p.m. to almost 11:00 p.m., when she left to drive to work at her other job as a mental health counselor in a group home.

*Jane Doe*

Arevalos pulled Jane Doe's car over and said she had not used a turn signal when she made a left turn. She disagreed with him. Upon inquiry, she said she had not consumed any alcohol for more than three hours. She underwent a breathalyzer test, which showed she had a blood alcohol content of .09 percent.[2] Arevalos told her he could see she was surprised, but she should not worry because there were "still options." Arevalos had a more sophisticated breathalyzer in the trunk of his patrol car. The results on this machine were .08 percent on the first reading and .09 percent on the second reading. At that point, Jane Doe started "freaking out." In response, Arevalos told her to calm down, that she had options, and "might be able to work something out." Arevalos crumpled the breathalyzer results and directed Jane Doe to drive to a nearby 7/Eleven store. He asked her what was she willing to do to avoid a DUI arrest and said they could make a deal.

Jane Doe responded: "I don't know. What is it that you want?" Arevalos told her that someone had given him a bra and panties in exchange for not getting arrested. Jane Doe said she would rather not give him her bra because it was new and expensive, but

_____

2      Vehicle Code section 23152 proscribes driving a vehicle when the driver has .08 percent or more, by weight, of alcohol in his or her blood. (Veh. Code, § 23152, subd. (b).)

3

would give him her underwear.  Arevalos agreed.  They entered the 7/Eleven store and, when the bathroom became available, Arevalos opened the door for her and followed her inside.  Jane Doe took off her panties and handed them to Arevalos, who told her that she had "really nice breasts" and he wanted to see them.  Jane Doe lifted her shirt and lifted her breasts out of the bra.  Arevalos then went over to her, put his hand on her vagina and started to rub her vagina with one of his fingers.  Arevalos then put his arm around her and said, "It will be better if you lean against me" and pulled her against his shoulder.  Jane Doe testified she did not feel free to leave the bathroom.

After leaving the 7/Eleven store, Arevalos told Jane Doe that it would take 30 days for the positive breathalyzer test results to be removed from the system and asked for her telephone number to contact her when this occurred.  He said he would call her and meet her for coffee when everything was cleared.  Arevalos also returned Jane Doe's panties.

The next day, at the urging of her boyfriend and a girlfriend, Jane Doe reported the incident to police.  At the request of a police detective, Jane Doe arranged a pretext call with Arevalos.  The gist of the call was that she was concerned he would turn in the DUI paperwork because their deal was for her panties and he had returned the panties.  Arevalos assured her that she could trust him and said he would have liked to have spent more time with her.  Jane Doe asked Arevalos if he liked her breasts; he replied: "Absolutely[,] girl!"  He also said, "your vagina was very nice."  Arevalos said he particularly liked it when her shirt was lifted and her pants were down.  "I didn't expect your body to be as nice and wonderful as it was."

4

Police arrested Arevalos on March 11. The same day, the chief of police held a press conference and issued a press release about the arrest, and asked women who had experienced incidents similar to Jane Doe's to contact the police department. As a result of this announcement and the ensuing press and internet coverage, several women contacted the police department. The jury convicted Arevalos of sexual battery of Jane Doe by restraint, soliciting a bribe, assault and battery by an officer and misdemeanor false imprisonment.

*M.R.*

In 2009, M.R. was the manager of Dick's Last Resort in downtown San Diego. On September 28, 2009, she left work between 2:00 and 3:00 a.m. When M.R. turned the wrong way on a one-way street, Arevalos approached her car from the opposite direction and pulled her over. Arevalos said he smelled alcohol, and M.R. said she had a few drinks. While she was undergoing a field sobriety test, Arevalos commented that she was wearing "interesting underwear." The underwear had a waistband that read "I love Dick" and was a promotional item sold at Dick's Last Resort. After the field sobriety test, Arevalos said, "we'll see what happens after the breathalyzer test" and "[w]e'll see if we can work something out." By this time another officer had arrived at the scene, and that officer stayed there with M.R.'s car, while Arevalos drove her to police headquarters to perform a breathalyzer test. After the breathalyzer test, Arevalos said, "I got ya. Now

we're going to have to work something out." M.R. asked what her test results were, but Arevalos did not give her a number.[3]

While driving M.R. back to her car, Arevalos asked what kind of favor she could do for him. She replied that she did not have any connections or money and did not know "what you want from me." Arevalos continued to say, "I think we can work something out" and repeatedly asked her to offer a suggestion. M.R., who thought Arevalos had been flirting with her from the beginning of the stop, believed he wanted a sexual favor. When they returned to her car, Arevalos told her it was not over yet. Arevalos said he knew where she worked and when he went there she was going to pay him back for not arresting her for driving under the influence. M.R. testified: "I was . . . under the impression that . . . he was doing me the favor already and that I had to give him a favor in the future . . . ." The jury convicted Arevalos of soliciting a bribe from M.R.

*Melissa M.*

Melissa M. was a part-time waitress and a nursing student. On January 9, 2010, she, was driving from a birthday celebration at the Red Circle, a club in the Gaslamp district, to her boyfriend's residence when Arevalos pulled her car over for making an improper left turn. Upon inquiry, Melissa M. told Arevalos she had one or two drinks. Arevalos told her to step out of the car and undergo field sobriety tests and then a

---

3    The results were .16 percent and .15 percent

breathalyzer test. Arevalos did not tell her the result of the breathalyzer test, but said she was going to jail because she had failed the test.

Melissa M. asked Arevalos to give her a ticket rather than arresting her. Arevalos responded by asking her if there was something she would do instead of going to jail. She offered Arevalos money, but he refused and asked if there was anything else she would do "under the table." Arevalos asked her to go to a nearby, more private location so they could talk further. He suggested she pull down the shoulders of her dress and show him her breasts. Melissa M. agreed. When Arevalos approached her car at the second location he asked her to show him "something." Instead, Melissa M. gave Arevalos a piece of paper with a telephone number on it and told him to call her. She then drove away. The telephone number was fake.

Melissa M. testified that at the initial stop location she did not believe she was free to leave. The jury convicted Arevalos of soliciting a bribe from Melissa M. and misdemeanor false imprisonment.

*Melissa W.*

On the evening of October 22, 2010, Melissa W. was dancing with friends at the Whiskey Girl, and left at 1:45 a.m. She and her friends walked around downtown for one half-hour before she decided to go home. She went to her car, parked at Fourth Avenue and Island Street. After she drove out of the space, Arevalos immediately pulled her over and told her she had stopped at a stop sign too long. Melissa W. started crying. Arevalos asked if her breasts were real.

7

Melissa W. testified: "I was shocked by that comment. And I said, No." Arevalos next asked her if she had ever competed in a wet T-shirt contest and she said she had not. Arevalos told her to stop crying. He said: "We're just two people right now. Tell me more about yourself. Tell me why I shouldn't arrest you right now." Melissa W. related that she was a nursing student. After the subject of modeling was raised, Arevalos asked if she was "manicured everywhere."

Arevalos repeatedly asked Melissa W. what they were going to do about the situation. "Let's figure out something," he said. Arevalos asked if she would take a breathalyzer test; Melissa W. refused. Arevalos was amused by her refusal. Holding a hand-held breathalyzer, Arevalos started to rub Melissa W.'s nipple with the portable device and asked if it felt good. Melissa told him it hurt. Arevalos asked if she had ever offered favors to a police officer who had pulled her over. Melissa W. answered that she had not.

Arevalos said: "We need to figure something out." He said if she flashed her breasts for him and let him put his hand down the front of her pants, he would let her go. Melissa W. lifted her shirt and showed Arevalos her breasts. He then put his left hand down the front of her jeans and rubbed her pubic area--from the vagina around to her buttocks--several times. Before letting her leave, Arevalos asked if she knew his name and the statute of limitations for driving under the influence. Arevalos than hailed a cab for her.

The jury found Arevalos guilty of soliciting a bribe from Melissa W., assault and battery by an officer, and misdemeanor false imprisonment. The jury was unable to reach a verdict on a count of sexual battery by restraint.

*Jeannie E.*

On December 29, 2010, Jeannie E. was driving home after spending the evening dancing with two friends in the Gaslamp District when Arevalos pulled her over because the registration on the vehicle was expired. Arevalos said the car smelled like alcohol. Jeannie E., 20 years old at the time, took a breathalyzer test; the result was a blood alcohol level of .05 percent.[4] Arevalos told her that she was going to get a severe penalty and he had to have the car towed.

Jeannie E. testified she was "freaking out" and asked Arevalos if there was "anything I can do to get out of this"--referring to the towing. Arevalos replied: "Well, what can we do to . . . fix the situation? What do you have to offer me? How much is this . . . ticket worth to you?" Jeannie E. told Arevalos that she was a student and had no money to offer him. Jeannie E. believed Arevalos was implying that he would not give

---

4    Because Jeannie E. was under the age of 21 years, she was in violation of the law even though her blood alcohol concentration was less than .08 percent. Vehicle Code section 23136 prohibits any person under 21 years of age from driving with a blood-alcohol concentration (BAC) of 0.01 percent or greater, as measured by a preliminary alcohol screening (PAS) test or other chemical test. (Veh. Code, § 23136, subd. (a).) The Supreme Court and other courts have referred to section 23136 as the "zero tolerance" law. (See *In re Jennings* (2004) 34 Cal.4th 254, 262; *In re Jennifer S.* (2009) 179 Cal.App.4th 64, 72; *People v. Bury* (1996) 41 Cal.App.4th 1194, 1207; *Coniglio v. Department of Motor Vehicles* (1995) 39 Cal.App.4th 666, 673.)

her a DUI ticket in exchange for a sexual favor.  Arevalos also asked Jeannie E. what she was wearing under her coat.

When another patrol car stopped at the scene, Arevalos said: "Well, I guess the deal's up."  Arevalos then gave Jeannie E. a citation.  The stop had lasted 45 minutes. Arevalos asked her if things would have been different if her friends were not present; she replied no.  Arevalos told Jeannie E. not to tell her friends about the conversation. Arevalos allowed one of the friends to drive the car away.  The jury convicted Arevalos of soliciting a bribe from Jeannie E., and misdemeanor false imprisonment.

The police department operates an Automatic Vehicle Location (AVL) system that shows the location of police patrol cars at a particular time and allows the department to identify these locations for a given date and time.  For each of the five victims--Jane Doe, M.R., Melissa M., Melissa W. and Jeannie E.--the AVL system corroborated their testimony about being pulled over by Arevalos with respect to the locations and durations of the stops.

Pursuant to Evidence Code section 1101, subdivision (b), the jury also heard testimony from four women who had been pulled over by Arevalos and subjected to sexual suggestions and improper comments and conduct.  Arevalos was not charged with crimes in connection with their testimony.

DISCUSSION

I

Arevalos contends the trial court erred by refusing to disqualify the district attorney's office from prosecuting him.

On October 20, 2011, after the jury was impaneled but before the presentation of evidence, Arevalos's counsel made an oral motion to disqualify the district attorney's office from prosecuting his client on the ground that District Attorney Bonnie Dumanis had an actual or apparent conflict of interest. Dumanis, at the time a candidate for San Diego Mayor, had appeared on television the previous evening, and, according to defense counsel, referred to this case in explaining why she did not receive the endorsement of the San Diego Police Officers Association for her mayoralty bid. Counsel related Dumanis said she had not sought the association's endorsement in part because there were criminal cases pending against police officers. Defense counsel acknowledged that Dumanis did not mention Arevalos's name on television, but referred to him indirectly as the officer currently on trial. Counsel argued disqualification was required because politics had been involved in the manner in which Arevalos's case had been handled, and this, at the very least, created an appearance of impropriety. Counsel said the district attorney had maintained a harder line than her normal practice with respect to plea bargain negotiations. In denying the recusal motion, the trial court said defense counsel had not demonstrated a conflict of interest, an inability of the prosecutor to act impartially, or that it was unlikely Arevalos would not receive a fair trial.

The statutory ground for disqualifying a prosecutor is section 1424, which provides the trial court may not grant a motion for disqualification "unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant

would receive a fair trial."  (§ 1424, subd. (a).) [5]  "[A] 'conflict,' for purposes of section 1424, 'exists whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner. . . . [I]t warrants recusal only if 'so grave as to render it unlikely that defendant will receive fair treatment during all portions of the criminal proceedings.' "  (*People v. Eubanks* (1996) 14 Cal.4th 580, 592.)  Both aspects of this standard must be considered:  (1) is there a conflict of interest; and (2) if so, whether the conflict is "so severe as to disqualify the district attorney from acting."  (*Id*. at p. 594.)  "Thus, while a 'conflict' exists whenever there is a 'reasonable possibility that the [district attorney's] office may not exercise its discretionary function in an evenhanded manner,' the conflict is disabling only if it is 'so grave as to render it unlikely that defendant will receive fair treatment.' "  (*Ibid.*)  The likelihood the defendant will be deprived of fair treatment "must be real, not

---

[5]     Section 1424 sets out the procedure for seeking to disqualify a district attorney:  The notice of a motion to disqualify a district attorney is to be served on the district attorney and the Attorney General at least 10 court days before the motion is heard.  (§ 1424, subd. (a).)  The notice of motion must contain a statement of the facts setting forth the grounds for the claimed disqualification and the legal authorities relied on by the moving party, and shall be supported by affidavits of witnesses competent to testify to the facts set forth in the affidavit.  (§ 1424, subd. (a).)  The district attorney or the Attorney General, or both, may file affidavits in opposition to the motion, may appear at the hearing on the motion, and may file with the court hearing the motion a written opinion on the disqualification issue.  (§ 1424, subd. (a).)  The judge reviews the affidavits and determines whether an evidentiary hearing is necessary.  (§ 1424, subd. (a).)

12

merely apparent," (*id.* at p. 592), and must go beyond the mere appearance of impropriety. (*Id.* at pp. 592-593.)[6]

On appeal, "[w]e must review the superior court's factual findings for substantial evidence and, based on those findings, determine whether the trial court abused its discretion in denying the recusal motion." (*Hambarian v. Superior Court* (2002) 27 Cal.4th 826, 834.) The trial court's "application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 712, fn. omitted (*Haraguchi*).) The defendant "bear[s] the burden of demonstrating a genuine conflict." (*Id.* at p. 709.)

We note a defendant attempting to disqualify a prosecutor or the prosecutor's office is required to file a written motion, supported by affidavits, and to give notice to the prosecuting office as well as the Attorney General. (§ 1424, subd. (a); fn. 5, *ante*.) However, given the timing of Dumanis's televised comment, it would be unfair to use the procedural requirements of section 1424 to preclude Arevalos from seeking disqualification.

As to the substantive issue, we conclude the trial court's findings were supported by substantial evidence and the court did not abuse its discretion in denying the motion. In moving for disqualification, defense counsel relied on Dumanis's televised explanation for not securing an endorsement supporting her mayoralty campaign. The trial court found the televised remark was insufficient to establish a conflict of interest within the

6    The trial prosecutor articulated this standard, which was followed by the trial court. We disagree with Arevalos that the court applied the wrong standard.

meaning of section 1424--that is, a conflict in which there is a " 'reasonable possibility' of less than impartial treatment" by the district attorney. (*Haraguchi*, *supra*, 43 Cal.4th at p. 713.) The record supports the trial court's findings. The district attorney's comment was on an unrelated issue--a law enforcement group's endorsement for mayor. Furthermore, Dumanis did not mention Arevalos by name and did not discuss the merits of the case. In seeking disqualification, defense counsel in effect asked the trial court to make a logical leap not supported by evidence.

A motion to disqualify a prosecutor must be based on a likelihood of unfairness and not on mere speculation. (*People v. Parmar* (2001) 86 Cal.App.4th 781, 800; see also *Spaccia v. Superior Court* (2012) 209 Cal.App.4th 93, 107-108.) Dumanis's impromptu and indirect comment about the case on the eve of trial lacked a reasonable nexus to the conflict of interest suggested by defense counsel. Assumptions and appearances are not evidence. The evidence must show there is a real, and not merely an apparent, likelihood of unfairness. (*People v. Eubanks*, *supra*, 14 Cal.4th at p. 592.) A prosecutor cannot be disqualified under section 1424 "merely because the district attorney's further participation in the prosecution would be unseemly, would *appear* improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system." (*Ibid*.) "Only an *actual likelihood of unfair treatment*, not a subjective perception of impropriety, can warrant a court's taking the significant step of recusing an individual prosecutor or prosecutor's office." (*Haraguchi*, *supra*, 43 Cal.4th at p. 719.) Here, defense counsel did not meet her burden to show a cognizable conflict

14

under section 1424 based on Dumanis's televised comment. (*Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 735 & fn. 10.)

As our Supreme Court has observed: "Prosecutors are public fiduciaries. They are servants of the People, obliged to pursue impartially in each case the interests of justice and of the community as a whole. When conflicts arise that compromise their ability to do so, they can and should be recused. But defendants bear the burden of demonstrating a genuine conflict; in the absence of any such conflict, a trial court should not interfere with the People's prerogative to select who is to represent them." (*Haraguchi*, *supra*, 43 Cal.4th at p. 709, fn. omitted.)

Even were we to assume defense counsel established a section 1424 conflict of interest based on the televised comment by Dumanis, the question would remain whether the possibility of prosecutorial unfairness was "so great that it is more likely than not the defendant will be treated unfairly" by the prosecution. (*Haraguchi*, *supra*, 43 Cal.4th at p. 713.) Defense counsel did not meet her burden to show the purported conflict of interest was of a magnitude to render it likely that Arevalos would not receive a fair trial. (See *People v. Hamilton* (1989) 48 Cal.3d 1142, 1155-1156.) Further, we note "[re]cusal of an entire district attorney's office is an extreme step. The threshold necessary for recusing an entire office is higher than that for an individual prosecutor." (*People v. Cannedy* (2009) 176 Cal.App.4th 1474, 1481.) "An entire prosecutor's office should not be recused unless it is necessary to assure a fair trial. The showing of a conflict necessary to justify so drastic a remedy must be especially persuasive." (*Spaccia v. Superior Court*, *supra*, 209 Cal.App.4th at p. 107.)

15

Arevalos argues the district attorney's office should have been disqualified because Dumanis's "political ambition" adversely impacted prosecutorial decisions made in his case, such as the office's hard line approach during plea bargain discussions, as well as charging him with numerous crimes that were without evidentiary support. We are not persuaded.

Regarding the prosecution's purported hard line approach to plea bargaining, we note defense counsel did not follow the statutory requirements of section 1424, subdivision (a) (see fn. 5, *ante*); those requirements were not excused by time considerations. Although plea bargain negotiations had already occurred, there were no supporting affidavits to support defense counsel's representations that Arevalos had been treated unfairly in those negotiations.

On appeal, Arevalos argues Dumanis assumed "a 'harder line' on plea offers to [him] than was her normal practice" because "[t]he city was reeling from the impact of . . . multiple police misconduct cases," and his case--the worst of the lot--was a "political football." To a large degree, Arevalos's arguments are based on newspaper articles, containing multiple levels of hearsay, submitted to the court in connection with a motion for change of venue. The record sheds little information on what occurred during plea negotiations in this case. The trial prosecutor said Arevalos was not willing to plead to the sexual battery counts and was unwilling to agree to sex offender registration as part of

16

a plea.[7]  Further, there was no comparative evidence from which the court could conclude the district attorney's office took a harder line here than it did in other cases.

Even were it established the district attorney's office took a harder line in this case, that does not justify disqualification.  In *People v. Parmar*, *supra*, 86 Cal.App.4th at page 809, the court held that a prosecutor's conduct in pursuit of his or her duties, even if erroneous, does not support disqualification.  The trial court here echoed this sentiment.  (See also *Hambarian v. Superior Court*, *supra*, 27 Cal.4th at p. 843 [prosecutors " 'are necessarily permitted to be zealous in their enforcement of the law' "].)  The purported overcharging by the district attorney's office was not raised before the trial court and we decline to consider it.

## II

Arevalos contends the trial court erred by not granting him a new trial on the counts involving Jeannie E. (soliciting a bribe and misdemeanor false imprisonment) and Melissa W. (soliciting a bribe, assault and battery by an officer and false imprisonment) because newly discovered evidence contradicted their testimony that they were not seeking civil damages against him.

Jeannie E. testified she had not filed a lawsuit against Arevalos, but was aware other women had.  Further, although she considered suing Arevalos, she decided against

---

7     Appellate counsel contends the record stated the prosecutor confirmed that there was no offer in this case and the only way to avoid trial would be a plea of guilty to all charges.  First, we do not read the prosecutor's comments as confirming the absence of an offer, and, second, the prosecutor merely stated that on the day of trial, Arevalos would have to plead to all charges.

17

it.  She also testified she did not fill out a retainer agreement, which a civil attorney had sent while she was studying abroad.  Later in the trial, the prosecutor informed the court she had received an e-mail from attorney Alex Galindo stating he had filed a government tort claim against the city of San Diego on behalf of Jeannie E. while she was studying abroad to preserve her ability to sue the city even though she had not returned the retainer agreement to her.

Melissa W. testified she contacted the San Diego County Bar Association Lawyer Referral Service because she had questions about what had happened.  Melissa W. testified she had not retained or consulted with a lawyer to sue Arevalos and did not intend to do so.

Arevalos filed a motion for a new trial on the ground of newly discovered evidence--namely, that Jeannie E. and Melissa W. had filed civil claims against the city and Arevalos.[8]  After the jury began deliberations, Melissa W. filed a claim against the city and Arevalos.

The trial court denied the new trial motion.  The court found the civil claims filed by the two women did not constitute newly discovered evidence within the meaning of section 1181.  The court noted: "Hanging over this trial was this balloon, if you will, that each of the people involved, victims, would or could . . . file a lawsuit."

A criminal defendant may move for a new trial on the ground of newly discovered evidence.  (§ 1181, subd. 8.)  A trial court's determination of a motion for a new trial

---

[8]    The initial motion for a new trial incorrectly identified Melissa M. as Melissa W. This error was corrected in an amended motion for a new trial.

18

" ' "will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' "  (*People v. Delgado* (1993) 5 Cal.4th 312, 328 (*Delgado*).)  A new trial should have been granted if the newly discovered evidence was material to Arevalos's defense and "he could not, with reasonable diligence, have discovered and produced [the evidence] at the trial."  (§ 1181, subd. (8).)

There are five factors to consider when ruling on a motion for new trial based on newly discovered evidence: " ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' "  (*Delgado*, *supra*, 5 Cal.4th at p. 328.)

To entitle a party to a new trial, the motion must show the newly discovered evidence was material and not merely cumulative.  (*People v. Howard* (2010) 51 Cal.4th 15, 43; *Delgado*, *supra*, 5 Cal.4th at p. 328.)  The trial court must also determine, based on an objective standard, whether the new evidence was of sufficient strength to show that a different result was probable in a retrial that included the presentation of this evidence.  (*Delgado*, at p. 328; see also 6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Judgment, § 105, pp. 146-148.)

The standard of review is abuse of discretion.  (*People v. Ault* (2004) 33 Cal.4th 1250, 1260.)  On appeal from an order denying a new trial sought on this ground, we apply the same test, determining the materiality of the evidence and whether a different

19

result on retrial was reasonably probable considering the evidence. (*People v. Martinez* (1984) 36 Cal.3d 816, 821.)

The court did not abuse its discretion by denying the new trial motion. The civil claim filed by Jeannie E. was not new evidence; attorney Galindo's e-mail to the prosecutor during the trial alerted the defense of the existence of the claim. The e-mail also tended to corroborate Jeannie E.'s testimony that she did not know the claim had been filed on her behalf. As to Melissa W.'s filing of a claim after her testimony, Arevalos did not show it was probable that such evidence would have led to a different result in a retrial. The victims were cross-examined about seeking civil redress against the city; Arevalos and the jury were aware this was a possibility. We agree with the trial court's assessment: "Nothing would have changed. The fact is that [Melissa W.] has a right to file a lawsuit. She has a right to change her mind."

Moreover, it has long been held that "newly discovered evidence which would merely impeach or discredit a witness does not compel the granting of a new trial [citation], and a new trial will not ordinarily be granted for newly discovered evidence of that character." (*People v. Moten* (1962) 207 Cal.App.2d 692, 698; see also *People v. Green* (1982) 130 Cal.App.3d 1, 11 ["[a]s a general rule, 'evidence which merely impeaches a witness is not significant enough to make a different result probable' "].)[9] The trial court did not err by denying Arevalos's motion for a new trial.

---

[9]     We deny Arevalos's motion to take judicial notice of a declaration by Melissa W. filed in her federal lawsuit against the City of San Diego and Arevalos. (Evid. Code, §§ 452, subd. (d), 459.) In resolving criminal appeals, appellate courts are tasked with

III

Arevalos contends the trial court committed prejudicial error by repeatedly interrupting his counsel's closing argument to comment that counsel was vouching. He identifies eight specific instances.

Preliminarily, we note that although the trial court repeatedly characterized parts of defense counsel's closing argument as "vouching," the characterization was not strictly in keeping with the term as it is used in reported cases. Vouching as a term of art usually refers to the prosecutor supporting the credibility of a witness based on the prosecutor's personal belief or by referring to evidence outside the record. (*People v. Turner* (2004) 34 Cal.4th 406, 432-433.) "Impermissible vouching occurs 'where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony.' " (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1167, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

What the trial court apparently found objectionable in the instant case would have been better described as defense counsel injecting her personal beliefs into her argument. Counsel should refrain from inserting personal beliefs and opinions in their closing

assessing the correctness of judgments as of the time of their rendition, on a record of matters that were before the trial court. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) Here, we are called on to determine if the trial court erred by denying the new trial motion. The declaration does not assist us in that regard. We further note that in matters on direct appeal, appellate courts generally do not make initial factual findings based on new evidence. This " 'is not the forum in which to develop an additional factual record' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 953); rather, " 'our review on direct appeal is limited to the appellate record.' " (*Id*. at p. 952.)

21

arguments.  (5 Witkin & Epstein, Cal. Criminal Law, *supra,* Criminal Trial, §§ 771, 791, pp. 1198, 1222.)  "Any kind of 'indirect testimony' in argument by statements of personal belief on a matter in issue is improper."  (*Id.* at § 771, 1198.)  The proscription applies to defense counsel.  "[W]e find no reason why defense counsel are not equally barred from expressing their personal beliefs.  Jurors are just as likely to interpret defense counsel's remarks as being based on outside knowledge."  (*People v. Tyler* (1991) 233 Cal.App.3d 1456, 1460.)  We also note rule 5-200(E) of the Rules of Professional Conduct prohibits all attorneys from asserting "personal knowledge of the facts at issue, except when testifying as [witnesses]."

Although defense counsel typically are given broad leeway in closing argument, the trial judge is required "to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."  (§ 1044.)

The issue Arevalos raises is whether the eight instances--considered together--constituted judicial misconduct.  "A trial court commits misconduct if it 'persists in making discourteous and disparaging remarks to a defendant's counsel . . . and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge, and in other ways discredits the cause of the defense . . . .' "  (*People v. Fudge* (1994) 7 Cal.4th 1075, 1107.)  "We 'evaluate the propriety of judicial comment on a case-by-case basis, noting whether the peculiar content and circumstances of the court's remarks deprived the accused of his right to trial

22

by jury.' [Citation.] 'The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made.' " (*People v. Sanders* (1995) 11 Cal.4th 475, 531-532.)

In the first instance referenced, counsel was attempting to argue the alleged victim of seven counts had testified falsely and asked the jury to recall the testimony of a district attorney investigator, which was allowed for a limited purpose. The court sustained the prosecutor's "facts not in evidence" objection, explaining: "It's not in evidence. Ladies and [gentlemen,] that was let in for a limited purpose." The court added: "Also, watch the vouching." This court's "vouching" remark was an innocuous and harmless statement. The jury acquitted Arevalos of the seven counts involving the alleged victim.

In the second instance, the court interrupted counsel as follows:

"[DEFENSE COUNSEL]: His easy-going personality, which all the women testified about, 'Thanks. Oh, come on, you really want that? Oh, well, you got roommates. Well, then too bad'[--]even if that is an accurate rendition, which I highly doubt and I think there's reason for you to doubt . . . ."

"THE COURT: Counsel, vouching. No vouching."

Again, there was no prejudicial error. Counsel inserted her personal opinion. Moreover, in this excerpt, counsel was discussing another alleged victim; the jury acquitted Arevalos of the single count involving her.

In the third instance, the prosecutor lodged an objection:

"[DEFENSE COUNSEL]: These are people . . . who are going to convict a police officer for felony bribery? . . . I sure hope not. I sure hope there's reasonable doubt in your minds.

"[PROSECUTOR]: Objection.

23

"THE COURT: Sustained. Counsel, vouching."

This concerned the same alleged victim as in the second instance referenced by Arevalos.

The fourth instance took place while counsel was discussing M.R.:

"[DEFENSE COUNSEL]: So when he saw her driving I think is a big issue on whether he had that prong to arrest her on this stop. Because, again, two circumstantial--in terms of the evidence, is the officer texting? . . .

"[PROSECUTOR]: Objection as to the officer texting. There is no evidence to support--

"THE COURT: Sustained. Ladies and gentleman--again, Counsel vouching. You did it again."

Again, counsel inserted her opinion.[10]

In the fifth instance, counsel again had been discussing M.R., when she turned to the use of the intoxilyzer:

"[DEFENSE COUNSEL]: What else about this stop is important, what came out of the intoxilyzer woman's mouth? I was shocked. I went, 'What, you only--

"THE COURT: I'm going to sustain [my own objection]. Counsel, I'm going--

"[DEFENSE COUNSEL]: No. Sorry.

"THE COURT: No. No, in chambers right now."[11]

---

[10]    Shortly after defense counsel resumed, she noticed she was about to inartfully state something and refrained herself: "I'm thinking that someone who wears--I'm not thinking of some that, could be vouching. Never mind, I withdraw that."

[11]    In chambers, the following colloquy occurred:

24

Although the subsequent chambers conference revealed the court had "jumped" the proverbial "gun" because counsel was only going to express her surprise about the limited number of breathalyzers available to San Diego police officers (see fn. 11, *ante*), the court's comment was noteworthy because it was the first hint of its irritation before the jury.

In the sixth instance, counsel was referring to a passenger in M.R.'s vehicle:

> "[DEFENSE COUNSEL]: And a little bit of bias he showed, because I actually liked him as a witness.
>
> "THE COURT: Counsel, we just talked about this.
>
> "DEFENSE COUNSEL: I'm sorry. . . ."

---

> "THE COURT: I've never heard a closing argument with more vouching. I've warned you, I've warned you several times. I'm keeping notes up there. Now can you just stop it?
> "[DEFENSE COUNSEL]: I'm sorry, your Honor. I was going to say I was shocked there were only 16 machines in the city.
> "THE COURT: Everything you say is, 'I believe, I think.' And there's different ways to do it.
> "[DEFENSE COUNSEL]: You are right. I'm sorry.
> "THE COURT: 'I was so surprised there was'--I've kept notes up there. It's over the top.
> "[DEFENSE COUNSEL]: I'm sorry. You are right. I'm sorry. I meant it was shocking is what I'll say.
> "THE COURT: You have completely put your credibility involved in this case. Don't do it.
> "[DEFENSE COUNSEL]: I'm sorry.
> "THE COURT: Otherwise, I will shut you down.
> "[DEFENSE COUNSEL]: I'm sorry. I meant it was shocking there [were] only 16 machines, is what I wanted to say. I just used the wrong words. I'm sorry."!(13 RT 3360-3361.)

25

The court's comment was appropriate.[12]

The seventh instance occurred the next day when counsel was discussing Arevalos's interaction with Melissa W.:

> "[DEFENSE COUNSEL]: If he's trying to reach down and cop a little feel, obviously not okay.  I don't believe the evidence supports that--
>
> "THE COURT:  Counsel, we're going to go through this like we did yesterday.  And I'm going to sustain my own objections for vouching.  Do not vouch."

Subsequently, counsel deleted the "I" and told the jury: "The evidence does not support that."

In the eighth instance, counsel was discussing the blood alcohol level of Jane Doe and her credibility :

> "[DEFENSE COUNSEL]: If that was true, she was .014-ish.  If the other was true, people slipping things into her virgin drinks when they knew she had to go to work with kids.  I don't think that's credible evidence--

---

[12]    At the end of the day, outside the presence of the jury, the following colloquy took place:
> "THE COURT: "I never try to interrupt attorneys in argument.  In fact, I give lawyers a lot of leeway in argument.  But Ms. Von Helms, I cannot have you inject your credibility into this, your personal opinion.  You've done it over and over and over again, and you are not stopping.
> "[DEFENSE COUNSEL]: You are right.  I'm sorry, your Honor.  I will not do it again.  I will just say it was surprising.
> "THE COURT: Just take all the I's out, that the simple way to do it.
> "[DEFENSE COUNSEL]: You are right."!(13 RT 3372)!

26

"THE COURT: Let me interject at this point. The personal opinions of the lawyers are to be ignored and disregarded. The personal opinion[s] of the lawyers are to be disregarded. Okay?

"[DEFENSE COUNSEL]: Yes.

"THE COURT: Thank you.

"[DEFENSE COUNSEL]: I agree with that. It is not my opinion. It is your evaluation of the evidence. What I'm trying to show is to point out the evidence, point out the inconsistencies for you, point out what is reasonable doubt."

There was no error; the court merely reiterated part of an approved jury instruction as it saw fit. (See CALCRIM No. 222.)

Our review of the eight instances shows the court's vouching comments did not constitute judicial misconduct. The court's irritation with counsel's use of "I" was palpable to the jury only with respect to the fifth instance. Even were we to find the court incorrectly objected to counsel's use of "I" because in some of the instances she was properly arguing the evidence, any reading of the record in this case shows the jury would not have gleaned that the court was trying to discredit the defense or align itself with the prosecution. We agree with Arevalos that the use of the pronoun "I" in closing argument is not necessarily improper. (See e.g., *People v. Adcox* (1988) 47 Cal.3d 207, 237.)

Cases in which judicial misconduct have resulted in reversals on appeal invariably involve extremely egregious and demeaning attacks from the bench. (See, e.g., *People v. Fatone* (1985) 165 Cal.App.3d 1164, 1172, 1176 [conviction reversed based on an extensive pattern of judicial hostility toward defense counsel, which included belittling

27

suggestions, humiliating "elementary school scolding;" references to counsel's conduct as improper, unethical and taken in bad faith; and derogatory comments about counsel's ineptitude and lack of experience that permeated the record and defied a finding of no prejudice]; *People v. Zammora* (1944) 66 Cal.App.2d 166, 205-206 [trial court systematically belittled defense counsel before the jury by accusing him of making repeated objections, suggesting he look up what a leading question was, sarcastically referring to someone using ventriloquism to make his statement and accusing him of sleeping].) Here, we have examined every incident of which Arevalos complains and none, whether considered separately or cumulatively, rise to the level of prejudicial judicial misconduct.

Arevalos also complains the trial court interrupted his counsel when she asked the jury a rhetorical question. The court explained, outside the presence of the jury, that it did so because a number of the jurors appeared as though they were about to verbally respond to the question. There was no prejudice.

IV

Arevalos contends sufficient evidence did not support his conviction of soliciting a bribe from M.R. because he did not ask her for a bribe and did not condition his letting her go "on any reciprocal benefit."

M.R. was the manager of Dick's Last Resort whom Arevalos stopped after she drove the wrong way on a one-way street; he also smelled alcohol on her breath after the stop. On their way to the police station for a breathalyzer test, Melissa asked if she was going to get a DUI, Arevalos said, "[w]e'll see if we can work something out." After

28

M.R. tested at a blood alcohol level of  0.16 percent and 0.15 percent, Arevalos said: "I got ya.  Now we're going to have to work something out."  Arevalos repeatedly asked what Melissa could offer him.  Although Arevalos did not mention sex, Melissa believed Arevalos, who had been flirting with her, was seeking a sexual favor.  On arriving back at the location of the traffic stop, Arevalos told Melissa it was not too late for her to do something for him; he said he knew where she worked and he would go there later to collect.  Arevalos did not cite Melissa for DUI and allowed her to leave the scene with her passenger.

The standard of review for a sufficiency of the evidence claim is well established. We review the entire record most favorably to the judgment to determine whether it contains substantial evidence--that is, evidence that is reasonable, credible, and of solid value--from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.)  We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  Unless it is clearly demonstrated that "upon no hypothesis whatever is there sufficient substantial evidence to support [the verdict of the jury]," we will not reverse the judgment.  (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

Bribery may consist of either one of two acts--asking for a bribe or receiving a bribe.  (*People v. Powell* (1920) 50 Cal.App. 436, 442.)  "To constitute the crime of asking a bribe 'upon any agreement or understanding' that the official conduct of the party asking shall be influenced thereby, it is not necessary that the party solicited shall consent

29

to give the bribe, or that there shall be a meeting of the minds or mutual understanding or agreement between him and the party asking the bribe. It is sufficient if the latter is ready and willing to enter into a corrupt agreement or understanding that his official conduct shall be influenced by the bribe." (*Ibid.*)

The offense of soliciting or asking for a bribe " 'is complete when the solicitation is made, and it is immaterial that the object of the solicitation is never consummated, or that no steps are taken toward its consummation.' " (*People v. Shapiro* (1959) 170 Cal.App.2d 468, 478; *People v. Brigham* (1945) 72 Cal.App.2d 1, 6, 7 [crime of bribery is complete when defendant makes offer with a corrupt intent].) Pursuant to CALCRIM No. 2603, the jury was instructed: "To prove the defendant is guilty of [section 68], the People must prove that: The defendant was an executive officer of the City of San Diego; the defendant requested or asked for a bribe; three, when the defendant requested or asked for [a] bribe, he represented that the bribe would unlawfully influence his official act, decision or opinion; the representation may have . . . been express or implied; and number four, the defendant acted with the corrupt intent that his public or [official] duty would be unlawfully influenced. [¶] As used here 'bribe' means something of present or future value or advantage, or a promise to give such a thing, that is requested or taken with the corrupt intent that the public or official action . . . of that person who is requesting, taking or agreeing to take the bribe will be unlawfully influenced. [¶] A person acts with corrupt intent when he or she acts to wrongfully gain a financial or other advantage for himself, herself or someone else. [¶] . . . [¶] Requesting or agreeing to take a bribe does not require specific words or behavior, as long as the language used and the

30

circumstances clearly show that the person is seeking a bribe from someone. The People don't need to prove that the other person actually consented to give a bribe. The People do not need to prove the defendant made any effort to follow through on the purpose for which the bribe was sought."

There was substantial evidence Arevalos solicited a bribe from M.R. A solicitation does not require magic words. The bribe seeker need not use explicit language as to the consideration for the bribe; an inference may be drawn from suggestive language. (2 Witkin & Epstein, Cal. Crim. Law (4th ed. 2012) Crimes Against Governmental Authority, § 50, p. 1483.) Given Arevalos's flirting with M.R., his repeated representations that a deal could be struck or something could be worked out so she could avoid a DUI citation or arrest, and Arevalos's behavior with the other women who testified they were stopped by him under similar circumstances, the jury could reasonably infer Arevalos was seeking something of value from her in exchange for not citing/arresting her, and implicitly communicating that to her. The elements of the crime were met. Arevalos, an executive officer of the City of San Diego, impliedly asked for a bribe--something of present or future value or advantage--and impliedly represented that in exchange he would not do his official duty--cite/arrest M.R. for DUI. That is sufficient evidence to complete the crime of soliciting a bribe.

V

Arevalos contends the evidence was insufficient to support his convictions for sexual battery or assault and battery by an officer, and false imprisonment of Jane Doe because she consented to these acts to avoid a DUI citation or arrest.

31

Section 243.4, subdivision (a), provides: "Any person who touches an intimate part of another person while that person is unlawfully restrained by the accused or an accomplice, and if the touching is against the will of the person touched and is for the purpose of sexual arousal, sexual gratification, or sexual abuse, is guilty of sexual battery." As CALCRIM No. 935 provides: "Someone is *unlawfully restrained* when his or her liberty is controlled by words, acts, or authority of another and the restraint is against his or her will."

A police officer who takes advantage of a detainee's lawful restraint and "engages in acts for an improper purpose, such as sexual arousal or gratification . . . is unlawfully restrain[ing the detainee] during the illegal acts." (*People v. Alford* (1991) 235 Cal.App.3d 799, 804 [physical restraint of female inmates being transported between correctional facilities, although initially legal, became illegal during period when transporting officer sexually assaulted female inmate].)

As we understand Arevalos's argument, Jane Doe impliedly consented to the sexual battery because, when they were in the 7-Eleven bathroom, he asked to touch her vagina and she did not resist. We are not persuaded. The jury could reasonably conclude that Arevalos's unlawful assertion of authority vitiated any consent given by Jane Doe and he was guilty of sexual battery--that is, Arevalos touched the vagina of the "unlawfully restrained" Jane Doe "and . . . the touching [was] against [her] will . . . and [was] for the purpose of sexual arousal, sexual gratification, or sexual abuse." (§ 243.4, subd. (a).) As Jane Doe testified, "He was a cop with a badge and a gun, and I just--once I was in the bathroom, it felt like I had no choice. Like, whatever he had said, I would

32

have had to do because he was--he was the one . . . in charge. He had the power." This testimony was elicited when the prosecutor asked Jane Doe to what she was referring when she texted her boyfriend "[i]t sucks to have someone hold that kind of power over you."

"False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) In a false imprisonment case, " ' " 'it is essential that there be some restraint of the person; but it is not necessary that there be confinement in a jail or prison. Any exercise of force, or express or implied threat of force, by which in fact the other person is deprived of his liberty or is compelled to remain where he does not wish to remain, or to go where he does not wish to go, is false imprisonment. The wrong may be committed by acts or by words, or both. . . .' " ' " (*People v. Riddle* (1987) 189 Cal.App.3d 222, 228.) The restraint may be physical or psychological. (*People v. Arnold* (1992) 6 Cal.App.4th 18, 28.) The jury was instructed pursuant to CALCRIM No. 1242: "To prove the defendant is guilty of [misdemeanor false imprisonment], the People must prove: One, the defendant intentionally and unlawfully restrained or confined a person; [and] the defendant's act made that person stay or go somewhere against that person's will. [¶] An act is done against a person's will if that person does not consent to the act. In order to consent a person must act freely and voluntarily and know the nature of the act."

Arevalos argues that Jane Doe agreed to go to the 7/Eleven and enter the bathroom in the convenience store of her own free will to consummate the deal she struck with him--namely, give him her panties in exchange for a pass on the DUI. Further, Jane Doe

agreed to go in the bathroom because she did not want to remove her underwear in the car. However, there is substantial evidence Jane Doe did not agree that Arevalos would accompany her into the bathroom, as the following testimony shows:

> "[JANE DOE]: . . . and he opened the bathroom door for me. So I went in. Then he followed me in and shut the door and--
>
> "[THE PROSECUTOR]: What did you think when he came into the bathroom and shut the door?
>
> "[JANE DOE]: I was surprised. I did not expect him to come into the bathroom with me. I thought I would go in, take off my panties, given them to him, and that would be that.
>
> "[THE PROSECUTOR]: So once you get inside the bathroom and he shuts the door, then what happens?
>
> "[JANE DOE]: He stood in front of the door. I assume it was locked. . . ."

The jury reasonably could conclude Jane Doe stayed in the bathroom against her will and was falsely imprisoned there by Arevalos.

VI

Arevalos contends the evidence was insufficient to support his convictions of soliciting a bribe from Jeannie E. and falsely imprisoning her.

As discussed in Part IV, *ante*, the crime of soliciting a bribe is complete as soon as the bribe is sought. Arevalos asked Jeannie E. what she could offer him to "fix this situation? . . . How much is [this] . . . ticket worth to you?" The jury could reasonably conclude that Arevalos was implicitly asking for a bribe. There was substantial evidence to support his conviction of soliciting a bribe from Jeanne E.

As to the false imprisonment conviction, when Jeannie E. asked Arevalos if she could leave her car at the scene and get a ride home, he started asking what she would offer him to avoid a DUI arrest. At one point, he suggested they could go to his patrol car for a half-hour. Once he started soliciting a bribe, the originally lawful detention of Jeannie E. became an unlawful restraint. The jury could reasonably conclude Arevalos was unlawfully restraining her against her will. (See *People v. Alford*, *supra*, 235 Cal.App.3d at p. 804.) Substantial evidence supported Arevalos's conviction of falsely imprisoning Jeannie E.

## DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

McCONNELL, P. J.

HALLER, J.